Animal Clinic first? I'm sorry, I just didn't hear you. Do you care to hear from Appellant United Emergency Animal Clinic first? Yes. Sorry. My name is Eileen Kennedy. I'm an attorney with Berliner Cohen. I represent United Emergency Animal Clinic. We need you to speak up just a little bit. That's simply a recording device mainly.         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I'm embarrassed to hear and understand your argument. Okay. I apologize. It's not a problem. My name is Eileen Kennedy. I'm with Berliner Cohen, and we represent United Emergency Animal Clinic. Through this argument I might refer to United Emergency Animal Clinic for purposes of clarity and simplicity as UEAC. UEAC is an emergency animal care clinic. They operate facilities in San Jose at night as well as on weekends. They hire emergency care veterinarians to cover those shifts. The effective in 1995, they had hired doctors Psyche and Clark as the plaintiffs in this case over 10 years ago approximately, with the exception of Dr. Psyche, who was working with UEAC since 1995, as emergency care doctors. They both have licenses to practice veterinary medicine, and they were actually engaged in the practice of veterinary medicine while they were employed at UEAC. UEAC compensated them according to sort of a production basis formula, where they calculated the receipts, the monthly receipts based on the services provided to customers. They calculated the collections, half of the collections that they received for a particular month. Collections according to UEAC's definition were accounts that were outstanding for over 90 days. And from that adjusted receipts, they made certain adjustments. They subtracted charges for bubbling wells, which is cremation or burial services. They subtracted return checks, sales tax, refunds due to customer complaints, overpayments, professional discounts, as well as payments made to outside surgeons or specialists. Once they arrived at a gross, adjusted gross income of the clinic for the month, they took 30 percent of that number. They subtracted payments that they made to relief doctors, which were doctors that covered shifts that ordinary, regular, full or part-time doctors couldn't make from that sum. And then they divided that number by all of the long shifts, shifts of 12 hours or more, that were, that occurred during that particular month. They arrived at a per-shift pay. And then to figure out the individual doctor's month of compensation, they multiplied the number of shifts that that doctor, individual doctor worked by the shift pay. UEAC provided an advance to the doctors. Each individual doctor worked out with UEAC their own particular advance. In this case, Dr. Psyche and Dr. Clark both received a $4,000 advance. From the monthly compensation, that advance was subtracted to arrive at the, at the pay at the end of the month, or rather the middle of the month. Did their pay differ from month to month? Pay differed from month to month, depending on the amount of, of shifts that they worked and the, the income of the clinic. And this was true from 1995 through, through January of 2000, when the California law changed, and the executive director, aware that the law had changed, took it upon herself to review the payroll records to ensure that the doctors made at least the required minimum salary for California. The difficulty, of course, is that you're, the district court's finding, after trial, that, that was an unexpressed intent to do good. It is a difficulty here, but I think what, what I urge this court to consider is just what the average businessman would think, or the average manager would think, when seeing a law change, and knowing that the, the doctors that they were dealing with were making over $100,000 a year, anywhere from $7,000 to $15,000 a month, which is well over. No doubt you would think this is silly, but the reality is the law said you make an agreement to pay a predetermined minimum that doesn't fluctuate by quality or quantity. And there's, as Ralph's Grocery makes clear, there are ways to structure it, and no doubt you've already tried to do that in 2001 or 2, whenever it was that you changed the system. But, you know, how do you get around the district court's fact-finding? Well, I think, I think that what, what you do when you consider the California overtime argument is that you look to what the Secretary of Labor, the Secretary of Labor's regulations defining salary. Yeah, I just more or less paraphrased. And, well, in, well, in those regulations, they do refer to employment agreement, but they also refer to employment arrangement, which is not quite the same as an agreement, a legal agreement. It could, arrangement could certainly mean the mere provision of a guaranteed minimum amount. Well, but there's no guarantee. I mean, you know, throughout your, your briefs and whatever, you keep using the word guarantee, but where is the guarantee? I mean, in the practice of, in practice, these folks all made way more than the minimum wage, double the minimum wage, so there's no issue about that. But where's the guarantee? Well, the guarantee comes in with Nixon's review of the payroll records. Unexpressed, unexpressed to anybody. So where's the guarantee? If you're an employee, how do you, where do you, how do you know that that's going to happen? Well, it's certainly that these, these veterinarians wouldn't have known that because Ms. Nixon didn't tell them, but they also might have known that the law changed themselves. And in the event, and not, not only that, they would have known had they ever not worked their full-time hours. If I understand it, you're sort of making an interesting argument that because the law changed and because Ms. Nixon knew it, that you therefore would have known that the law would have, or must have, guaranteed it because you had to have under the law, even though you didn't. Well, I think that Ms. Nixon's testimony is that she knew it, and she was certainly aware of it because she has non-exempt employees, and the law changed with respect to overtime in California for those employees. So she did know, and there's no testimony that refutes that she didn't know. Right. And she did testify that she had the practice of reviewing the monthly payroll records to ensure that they were paid. Yes. And from the veterinarian's perspective, they, they know their doctors. They know they're highly skilled. They know they can go, they can take the services elsewhere and make more money if they, if they believe so. They took the risk inherent in a production-based formula. So the, the question would only arise if, for some reason, the doctors did not work the full amount of shifts to, or to make $2,000, which would have to be something less than two shifts per month. And, and that occasion had never arisen. But had the occasion arisen, then certainly UEAC, if Ms. Nixon's testimony is their intent was to pay it, they would know at that point. So the, the, the question is, it's just simply an, an occasion that never occurred. But the question is, does California require you to express this intent to the doctors? In, in these circumstances, why, why would, why would that, why would that requirement exist? If you followed exactly what the law told you to do? I don't know, but I'm not a legislator either. I mean, I just know what they wrote. Well, and again, I think that the, the key, the key phrase here is employment arrangement. And that that is something less or that, that is something that means something other than informed consent or notice, in this case, to the doctors. So what's the predetermined amount that does not vary with quantity or quality of the work? The predetermined amount under California law is two times the monthly state minimum wage. That's what the arrangement was. So I would have known had I come to work for your clinic, heaven forbid for your animals that I would have done that, but if I had come to work for your clinic, how would I know that that's what predetermined amount I was going to get without regard to how many shifts I worked or other people worked? If in the event that it ever occurred that you worked less. Or how many refunds there were. In the event that you ever worked less shifts than the, the amount that would be required at the time, you would know. But would you know going in beforehand if you were required to work 10 shifts a month for full-time status? No, you wouldn't. But it would never, it would never make a difference unless you actually earned less than what the guaranteed minimum is. Anyway, moving on, also, the issue raised by doctors in this case are whether or not they're entitled to overtime under the Fair Labor Standards Act. Under the Fair Labor Standards Act, the Secretary of Labor defines salary basis but includes an exception for all individuals that hold a license or a valid certificate to practice medicine and are actually engaged in the practice of medicine. And in defining the practice of medicine, the Secretary of Labor used extremely broad language. It specifically states practice of medicine or any of its branches in, in Section 514.3E. And in a separate regulation, the Secretary of Labor goes on to define practice of medicine as physicians and all other practitioners of medicine. The Secretary of Labor lists certain types of practices of medicine, including podiatrists, chiropractors, dentists, optometrists, as included within that definition of the practice of medicine. But that list in no way was intended to be exhaustive. It would make no sense if you were to exclude this exception from neurosurgeons versus dentists. The language is extremely broad and intended to cover, as well, practitioners of veterinary medicine. I suppose the question is whether this is just a kind of a totally different class from that, which is the... I think that, I think that what, what, I think that the, that the Department of Labor itself has recognized that veterinarians are not an entirely different class of medical practitioners. That in a handbook where they described occupations, they described veterinarians as engaging in work that's similar to medical practitioners of practice on humans. And in, in, in other, in other, in other... They don't have to get informed consent, though. I'm sorry? I was just commenting that they don't have to get informed consent from their patients. Well, that may be true, but that doesn't... It's a different kind of a practice. It really is. I... They are, they carry a degree of doctors of veterinary medicine, so I understand your argument. Not only that, they also perform surgery. They perform all types of medical appliance, medical procedures that are similar to what a medical practitioner on humans would be. And there's nothing in the regulation that should suggest to this court or others that there is no, that there is, that this particular regulation as an exception only applies to those who practice on humans. And if you think also about the practice of veterinary medicine, it's closely tied to the practice of medicine on humans. Veterinarians do provide advice to pet owners and custodians of pets on zoological issues, which is, which concerns the transfer of diseases from animals to humans. And there's no reason why a veterinarian who would be required to know some information regarding zoological issues that would actually have an effect on the practice of humans shouldn't be included within this regulation. Why are medical personnel excluded from the Fair Labor Standards Act? I... I have not, I don't have what the secretary of regulation put together when they were writing this particular regulation, but I believe that the thought behind it is that practitioners of medicine and law are able to use the market to achieve the higher rates of compensation and don't need the protections of the Fair Labor Standards Act that would require employers to pay them overtime. They can go out in the market, they can sell their skills, they're highly skilled, and they can go about and earn, they could sell these services and earn whatever they can command. If that is the purpose, do veterinary doctors fall within it? Yes, they do. Yes, they do. And they certainly can go elsewhere to find whatever services they want to find. They can go elsewhere to other emergency clinics to find production-based pay. And do remember that these doctors are making $100,000 or more a year, and certainly they were satisfied with it since they had been working there for over 10 years with respect to Clark and for Dr. Psyche for almost five years. In a separate issue that was raised ---- Now that they've historically paid, have any bearing on the issues that are in front of this Court? The quantum? I would say no. I would say that the Court would have to look at the broad language of Section 514.3 and 514.314 and determine whether or not practitioner of medicine includes veterinary medicine. And I would suggest that even the Department of Labor would say yes, it does. And just the language in and of itself suggests that that's all, that they should be included within that exception. Under the unlawful deductions argument, I just want to make this point quickly, a new case was decided after the district court rendered its decision finding that the deductions for collections, refunds, and return checks were unlawful. The new Ralph's decision indicates that as long as these doctors are exempt, the incentive-based formula is appropriate. Secondly, Dr. Clark argues that her evidence regarding unscheduled overtime was not properly considered by the district court. The district court used the correct legal standard. And in addition to that, if you look at the evidence, in other words you would have to overturn the district court if they were clearly erroneous, but based on the evidence that was presented, that finding cannot be made. And finally, with respect to the attorney's fees argument, the issue of attorney's fees for a breach of contract claim was never asserted in the complaint, nor was it asserted in the pretrial statement by Dr. Clark. And the district court can make whatever decision it determines based on whatever law is appropriate regarding whether or not that claim is a fee claim. But if you look at the specific request for attorney's fees in the complaint. But there is nothing in the complaint that says that that request for attorney's fees is for a breach of contract action. Well, there's nothing that says it isn't either. Well, it does say. For attorney's fees, how much more are you supposed to get? But, Your Honor, it does say that there is a request for attorney's fees for unlawful deductions and overtime wages, but the claim for breach of contract was never brought out in the complaint, and nor was the damage request in the joint pretrial statement before the court. Thank you. All right. Who's on first? May it please the Court. I'm John McBride. I represent Lisa Clark. My colleague, Mr. Kaye, is going to address the FLSA issue. Let me very briefly talk about the state overtime issue, and I would make two comments. Number one, if you were to accept the vet hospital's position, you'd have to rewrite Section 510 and write out the word salary. Salary is in there. Salary is a word of heart, and we know that these laws are to be narrowly construed. You just can't get there without taking the salary out of there. The other thing I would point out is that factually before the court, there was testimony that, number one, Ms. Annie Nixon had no authority to set salaries, never told the vets, never told the board, and did not believe she had an agreement with the veterinarians that there was a guaranteed minimum. Unless there are any questions on that issue, I'll pass. With reference to what I'll call the unscheduled overtime, first of all, factually what we're talking about, you probably already know, but just make sure I'm clear, we're all clear. The vets work 12 and 14-hour shifts, 12 hours during the week, 14-hour shifts, or maybe I have it wrong, 12 hours one time and 14 hours the next. My client testified to quite some degree or certainty that depending on when the shift ended, weekends, there was an overlap, a bigger overlap than weekdays, but depending on when the shift ended, she invariably had to work overtime because of passing the animals off to the next doctor or giving them back to their owners when they came to pick them up Monday morning. In any event, she testified very certainly and she testified to her own estimate as to how many hours on an average she had to work overtime. Another vet or former vet from the hospital testified also. Her figures were different, however, she indicated also that they almost always had to work overtime. Annie White testified that my client sometimes came in late, although she wasn't there to see that and she also was not there to indicate or to see whether or not they all got off on their respective shifts. That's basically the state of the evidence. Judge Fogle indicated, and I'm paraphrasing, but I think this is fairly accurate, while it may be that Plaintiff Lisa Clark worked overtime, the court would have to guess at the number of the hours that were worked. My reading of the two cases we cited, Brock and Tovar, indicate that that's essentially the same state of facts and the same ruling by the judge that was overturned by the appellate courts, saying these are different. These are situations where, number one, the employer is required to keep time records, and if there's evidence that there was overtime uncompensated overtime, the burden shifts to the employer if the employer didn't keep those records. The employer has to come forward and say this is not, that there was no overtime or it's not as much as the plaintiff is claiming, and there's language in the Brock case that it would be a prevarication of justice to allow the employer to get the benefit of not keeping the records that they are required to keep. Under those circumstances, and I realize that the judge may define it, under those circumstances, I think both Tovar and Brock indicate that that ruling by Judge Vogel should be reversed. With reference to the illegal deductions, in the brief, counsel has referred to Ralph's, the Ralph's case, and indicating that there's some indication in that case that this says this is a proper way of doing it. That's not what Ralph's holds. Ralph's stands for the proposition that exempt employees are not subject to the regulation, and I can't give you the citation, but the state regulation, because it says they're not subject to that, but that exempt employees are subject to that, but more importantly, Ralph's does not stand for the proposition that the practice that the veterinary hospital followed, canceled checks or bounced checks, refunds, and such, does not stand for the proposition that that practice is legal. In fact, under the other cases we cited, Hudgins, as an example, holds that that particular practice is a violation of Labor Code Section 221. 221 covers everybody, exempt and non-exempt employees. There's no distinction there. If there are any questions on that area, I'll go on. On the attorney's fees, I'm not quite sure where the mix-up came. I've reviewed the transcript, and I frankly, I think in hindsight, I should have spoken up when we were having the discussion with Judge Fogle when we made the motion for attorney's fees, because in reading the transcript, it becomes, I think, I'm interpreting his thought process, but he thought 218.5 was a specific section either providing a cause of action or tied specifically to the 200 series in the Labor Code, which spells out certain violations. I didn't disabuse him of that idea. I didn't understand that that was his thought process at the time, but if you look at the appellee brief on the issue of attorney's fees, the reduction, the 25-cent percent reduction, they state flat out that 218.5 only applies to violations of the Labor Code, where you're claiming violations of the Labor Code. Spells it right out. I think it's 1152 in the transcript. That is not the law. 218.5 is very clear. In any case in which you are making a claim for wages, the court shall award attorney's fees, and the only condition is that there be a request for attorney's fees when the action is initiated. There was a request for attorney's fees. It was contained in the prayer of the complaint. That's all that is necessary under 218.5. I'm not sure where Judge Fogle gets the idea that we changed our theory or anything like that. Our theory is set forth in the complaint. We had a number of issues. We had the overtime issue. We had the illegal deductions, and we had the other deductions that he found to be a breach of contract, but for which, because he said it was a breach of contract, we couldn't recover that proportionate amount of attorney's fees. It's a breach of contract not to pay the wages that were agreed upon. He implicitly found that the vet hospital agreed to pay the vets on a basis of this formula, did not tell them that it was going to reduce that by these other amounts, and therefore it was a breach of their employment agreement. But the claim is for wages. Whether it's a breach of contract or a violation of statute, 218.5 applies. I'd be glad to answer any questions. Any questions? I have none. Thank you. Thank you. Kays. Good morning. If it pleases the Court, my name is Greg Kays, and I represent Margaret Psyche, and I will address the issues on the FLSA claim, which, as the Court is aware, was decided on summary judgment. The plaintiff's position can best be summarized, I think, by simply stating that in this particular question, it is not our burden to demonstrate that the veterinarians are not covered. It's the employer's burden to demonstrate that this exemption applies to the plaintiffs. And the language in the cases indicates that the burden they must get over is couched in terms of plain and unmistakable. It's a question of law, though, isn't it? I mean, I don't know how the burden matters much. They're either we all know we know what they are. They're veterinarians, and we know what the statute and the regulations say. And it's just, there aren't. Does that interpretation vary depending on how much evidence is put in in one case or another or when somebody has a burden of proof or doesn't have it, or is it just a matter of are veterinarians included or not? I think it's the last. It's a simple statement that you look at the FLSA and say, okay, I've read it. I've read the first part, which the appellant focuses on, and I've read kind of the last part, which we focus on, which is where it talks about it refers to physicians, and then it specifically says physicians are medical doctors. Okay? So these are terms that are common, medical doctors, MDs, whether it's a neurosurgeon or an oncologist or an orthopedic surgeon. So osteopaths wouldn't count? Osteopaths are specifically called out. DO is specifically called out. Podiatrists are specifically called out. Dentists are specifically called out. Again, the distinction for the plaintiff has always been the references are to those who treat diseases in humans. Veterinarians are a different part of the expression. They're a different breed, because what the veterinarians are focused on is care and treatment of animals. When the FLSA was originally passed, I don't believe that society in its present form had the great focus on pets that we now seem to have in current parlance. Would a medical doctor who taught at Columbia University and didn't practice medicine at all qualify? An unlicensed medical doctor? No, licensed, but all they do is teach. If they're not engaged in the practice of medicine, no. I think they're not a professional. They might be chairman of the department, of the neurology department at Columbia University, but they wouldn't qualify. I don't think they would qualify because they're not actively engaged in the practice as a teacher. The dean of the College of Medicine at Stanford would not qualify. So long as that's all that he or she is doing, so long as that's it. But in the instance of veterinarians, again, I think you have to look at the entirety of the regulations and not simply say, well, at the outset it talks about medicine and all of its specialties. Clearly, they're DVMs, doctors of veterinary medicine. You'd be blind not to see medicine contained within their degree. But you have to read through the regulation and get to the point where they talk about physicians and practitioners of medicine as medical doctors. And I think the Circuit City case, which we've cited, this has all been briefed, where you have to look at rules of interpretation that apply and that the courts have applied. And when you start your most detailed description of what medicine means and you refer to physicians and medical doctors, I think the exclusion of veterinarians is somewhat startling. Now, you can compare some of the California regulations, some of the more recent California regulations, which are part of the appellant's brief in the appendix. And there, there is a reference to the health care industry. And veterinarians and the people that serve them are specifically called out within the health care industry. And as a comparison, you can look at those two and say, well, the California statute, there's no doubt, because it specifically refers to veterinarians and technicians, not technologists. But in the FLSA, there's nothing. And it's that nothing that we believe creates the ambiguity, which under the statutory interpretation means that the exemption does not apply. Did you have any occasion to or any way of determining the purpose of excluding physicians? Excluding physicians or? Why did Congress exclude physicians from coverage? Under the, oh, I'm sorry. So we know? Well, I have my own thoughts on that. I don't specifically know. But to me, I don't. Do you have any evidence of congressional intent? I do not. But I don't think you can simply say, because veterinarians can make six figures, that that's really a point of any relevance. Plumbers, electricians, skilled tradespeople can make substantially more than $100,000. And to me, the amounts being earned here are really simply being thrown out to cloud the issue. As we started out, it's not a fact issue. They're veterinarians, DVM, fine. But look at the statute. Unfortunately, there's no case. I've searched every jurisdiction I can think of, even up to yesterday. I can find no case that speaks to this specific point. It's interesting that it hasn't come up. It's the Fair Labor Standards Act. It's not a new statute. Exactly. And, you know, I tried my focus on what I thought were agricultural states. Nothing helped. But the point that I want to close on is that it is that plain and unmistakable language that, to the plaintiff, has always been the key question here, the key focus. Because if there is an ambiguity, and I believe there is, that really is the end of the question because of the burden that the FLSA places upon the employer to prove that the exemption applies. Just for my own information, what kind of coverage, what kind of remedy would you get more under the Fair Labor Standards Act than you have gotten under state law? Well, it would stretch back farther. Oh, okay. Because of that change in 2000. Yes. It's a more the damage claims for both plaintiffs would go up rather substantially. Okay. Thank you. Ms. Kennedy. Did you wish to say anything in rebuttal? No. All right. Thank you, counsel, for your argument. The matter just argued will be submitted. And the last case is submitted? The last case is submitted. The Court will stand in recess for the moment. Thank you.
judges: Canby, Rymer, Hawkins